IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2021

IN RE TYLER A.[1]

**Appeal from the Circuit Court for Bradley County**
**No. V-20-196          J. Michael Sharp, Judge**

_____

**No. E2021-00284-COA-R3-PT**

_____

This action involves the termination of a mother's parental rights to her minor child. Following a bench trial, the trial court found that clear and convincing evidence existed to establish the following statutory grounds of termination: (1) abandonment for failure to establish a suitable home; (2) the persistence of conditions which led to removal; (3) substantial noncompliance with the permanency plan; (4) failure to manifest an ability and willingness to care for the child; and (5) a present mental condition affecting the mother's ability to adequately parent. The court also found that termination was in the best interest of the child. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which ANDY D. BENNETT, J. and J. STEVEN STAFFORD, P.J., W.S., joined.

Joseph Christopher Stiles, Chattanooga, Tennessee, for the appellant, Misty B.

Herbert H. Slatery, III, Attorney General & Reporter, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

**OPINION**

## I.        BACKGROUND

Tyler A. ("the Child") was born to Jessica J. ("Mother") and Christopher A.[2] in January 2006. The Child and Mother moved to Cleveland, Tennessee from Ohio with Mother's fiancé, Michael C. ("Michael"), at some point in 2016 or 2017. They lived various places but were residing in a hotel when Michael was arrested for a violation of probation. The next day, on January 10, 2019, Mother was involuntarily committed, prompting the Tennessee Department of Children's Services ("DCS") to remove the Child from Mother's care. He was adjudicated as dependent and neglected and ultimately placed into a special needs home through MillarRich, a contract agency that provides services for children with a disability, based upon his prior diagnosis of autism. While still hospitalized, Mother threatened to take the Child and run away with him once released, prompting DCS to implement safety measures.

Tabitha Crow, the Child's family service worker, developed three permanency plans with the following requirements: (1) sign all required releases; (2) dissociate from known drug users or dealers; (3) obtain an alcohol and drug assessment and follow recommendations; (4) submit to random drug screens; (5) participate in family counseling and follow recommendations; (6) follow recommendations from her current mental health assessment; (7) identify a reliable individual who is a support in the event of another mental health crisis; (8) take all medications as prescribed by her physician; (9) attend regularly scheduled visitations; (10) maintain contact with the family service worker; (11) maintain appropriate housing for a minimum of six months; (12) remit child support as ordered by the court; (13) provide [DCS] with a valid driver's license, insurance, and registration or a transportation plan; (14) provide DCS with a rental lease agreement; (15) provide DCS with proof of legal income or proof of disability; (16) participate in any school meetings and comply with the Child's individualized education plan; and (17) otherwise maintain contact with the Child.

Mother failed to complete the majority of the requirements and also failed to attend two scheduled in-person visitations with the Child in April and May 2019.[3] On April 22, 2020, DCS filed a petition to terminate Mother's parental rights based upon the statutory grounds of (1) abandonment by failure to establish a suitable home; (2) the persistence of conditions which led to removal; (3) substantial noncompliance with the permanency plan; (4) failure to manifest an ability and willingness to care for the Child; and (5) a present mental condition affecting the mother's ability to adequately parent.

---

[2] The father is deceased.

[3] Opportunities for in-person visitation in the months prior to the filing of the termination petition were limited due to the COVID-19 pandemic and the Child's placement out of town.

The case proceeded to a hearing on October 13, 2020, at which several witnesses testified. Mother confirmed that she was living in a hotel with the Child and her fiancé at the time of his removal. She explained that she was "stuck for a minute" without housing because she refused to move forward with the planned purchase of a modular home when a member of the owner's family made a sexual advance toward her. She was unable to produce a copy of her current lease agreement but stated that she and Michael have resided there for six months. She identified two prior lease agreements, one dated August 1, 2019, and a second dated February 14, 2020. She asserted that DCS first advised her to sign a lease for her second residence but then claimed that the residence was unsuitable.

Mother stated that her income is limited to $805 per month in Social Security Disability Income as result of an intellectual disability. She explained that she has a learning disability and was not "good with money." She provided that Michael serves as the payee for her income. She claimed that a prior payee of her disability income burned her house down in Ohio, resulting in the loss of her belongings and important paperwork and prompting her to move to Cleveland. She asserted that she was ready and willing to support the Child upon his return. She explained that the Child also draws Social Security Disability Income through his deceased father and that their income together would be sufficient to provide for his needs.

Mother conceded that she failed to comply with her discharge instructions upon her release from Ten Broeck Hospital in Cookeville, Tennessee. She explained that the person who retrieved her from the hospital stole her discharge instructions, prescriptions, and other belongings. She asserted that she contacted Ten Broeck after the theft but that personnel advised her to seek treatment in her county. She claimed that she was unable to seek treatment anywhere because she lost her identification in the fire. She was in the process of attempting to secure another copy of her birth certificate. Despite her lack of identification, she claimed that she was diagnosed with post-traumatic stress disorder at some point. She was unable to pursue treatment due to a problem with her insurance.

Mother testified that the Child, who is nonverbal and autistic, received disability services in Ohio but that similar services were unavailable in Tennessee.[4] Mother, clearly confused, repeatedly and exhaustively referred to the Child's services as "mental retardation" services.[5] She stated that he was only able to communicate his needs by bringing her pictures she provided for him and through a limited amount of sign language. She confirmed that the Child was in school at the time of removal. She could not remember

[4] DCS and Foster Mother confirmed that the Child is currently receiving services and progressing well in his new environment.

[5] Our Supreme Court has urged the use of "intellectual disability" rather than "mentally retarded" or "mental retardation." *Keen v. State*, 398 S.W.3d 594, 600 n. 6 (Tenn. 2012); *In re Christopher S.*, No. E2012–02349–COA–R3–PT, 2013 WL 5436672, at *3 n. 1 (Tenn. Ct. App. Sept. 27, 2013).

the name of the school. She asserted that the Child and Michael exhibited a father-son like relationship. She stated that their current visitation with the Child was limited to phone and video calls but that she believed the visits were good. She conceded that they were unable to attend two scheduled visitations due to lack of transportation. She provided that DCS offered bus tickets from Chattanooga to Murfreesboro but that they were unable to secure transportation from Cleveland to Chattanooga. She stated that Michael has since secured a vehicle with valid registration to assist with their transportation needs.

Mother denied ever being advised of the Criteria for the Termination of Parental Rights, either in court or by Ms. Crow, prior to the filing of the termination petition. She acknowledged that she signed such a document on May 13, 2020, approximately one month following the filing of the termination petition.

Michael testified that he and Mother have been in a relationship for approximately four years. He stated that he too relies upon disability income as a result of a physical disability. He conceded that he was arrested the day prior to the Child's removal. He explained that he was on probation for a misdemeanor shoplifting charge that arose out of his daughter's decision to shoplift while he was present. He claimed that his probation officer advised him that he did not have to attend court but that he was later arrested for failure to appear. He was released based upon his proof of the miscommunication.

Michael claimed that Mother's involuntary hospitalization was a result of a false accusation from Mother's prior payee. He explained that the payee was attempting to get Mother placed into a group home so that she could care for the Child and collect the disability income. He described Mother as "slow" but claimed that she was otherwise capable of caring for herself and the Child.

Michael stated that he enjoyed a father-son like relationship with the Child and that he has assisted Mother in caring for him. He confirmed that the Child was in school at the time of removal but also could not remember the name of the school. He claimed that he was willing to complete any DCS requirements to facilitate the Child's return. He asserted that Ms. Crow failed to communicate with them and would often provide last minute notification of meetings and visitations. He stated that he was unable to rearrange his schedule on such short notice. He provided,

> If I make a plan like anybody in life makes a plan, if you make a plan for today and someone calls, you've got that plan all scheduled and then they call five minutes before you start your plans saying, hey, you got this, your day is gone. I mean, I do a lot of important things. I do like to go and do things. Ride around, talk, whatever.

When asked to describe his daily routine, he stated,

- 4 -

> I get up. I help at home. I go out and see if I can scrounge up just any kind of little side job to make a dollar here or two. Because I'm a mechanic, I might do a brake job for somebody and make a few dollars. Those are my daily plans, just get up and try to live.

He confirmed that they were unable to secure transportation from Cleveland to Chattanooga and that Ms. Crow was unwilling to secure a bus from Cleveland to Murfreesboro. He stated that he was not provided with enough notice to secure transportation through SETHRA[6] or other like services and that he was also unwilling to disrupt a friend's day for a ride to Chattanooga on short notice. He has since secured transportation and has maintained his registration and a valid license since July 2020.

Michael acknowledged that he attended a number of the family team meetings and that Mother was advised of the requirements of the permanency plans. He claimed that Ms. Crow failed to schedule his assessments even though he was added to the plan in December 2019. She advised him that he would need to complete his assessments at some point in the future, but she never gave him a specific time frame. He admitted that he had not yet provided a copy of their lease agreement but stated that he could prove the stability of their residence through their rent receipts. He claimed that Ms. Crow had not returned to their residence to retrieve a copy but admitted that he could have taken a copy to the DCS office or provided a copy to the court at the present hearing.

Ms. Crow testified that she has served as the family service worker since the Child's removal and placement into DCS custody. She stated that it was several weeks before she was able to contact Mother. She asserted that Mother and Michael never really had any questions concerning the Child; instead, their main focus was concerning their allegations that he was taken unlawfully by DCS.

Ms. Crow claimed that she provides at least 10 days' advance notice as required by DCS before meetings or other appointments and that she arranged the two scheduled visitations with Mother's input and agreement on the selected dates in April and May 2019. She recalled that the Child was crying and very upset when they failed to arrive on the first date. She attempted to work with Mother in setting a budget to help with transportation costs and even offered a gas card in the event that they were able to secure their own transportation, but Mother again failed to appear on the second scheduled date. She could not secure additional bus tickets after Mother failed to utilize the bus tickets provided by DCS. She recalled that either Mother or Michael advised her of a plan to secure their own tickets and that they also advised Foster Mother on a few occasions that they would be in town on a certain date. However, they never visited the Child.

---

[6] Southeast Tennessee Human Resources Agency.

Ms. Crow testified that Mother was then offered telephone visitation on a weekly basis, beginning August 2019. She characterized Mother's involvement as inconsistent and explained that there were occasions where Foster Mother could not get in contact with Mother or where Mother returned a call when the Child was readying himself for bed or already asleep. She stated that the telephone contact, when it occurred, was otherwise unproductive because the Child was mostly nonverbal but still indicated his desire to end the call by saying "all done" and turning away from the phone. She admitted that Mother did interact with the Child at a permanency hearing in January 2020 but claimed that the Child pulled away from Mother in the hallway prior to the hearing. She stated that Mother did not stay after the hearing for visitation as planned. She explained that the Child was not brought to Cleveland on a regular basis due to his need for consistency and stability.

Ms. Crow testified that they have somewhat limited Michael's involvement due to his status as a non-parent and his overall unwillingness to cooperate. She explained that there were some instances where "things have gotten heated" and that he was often "very loud," "tried to talk over everyone," and was "argumentative" and "volatile." She further claimed that she had difficulty maintaining communication with Mother and that Mother failed to appear for scheduled appointments, e.g., her clinical parenting assessment.

Ms. Crow testified that she notified Mother by certified mail of the permanency plan responsibilities and the Criteria for Termination of Parental Rights in February 2020 and on other occasions. She confirmed that she received copies of Mother's prior leases but explained that the last lease she reviewed was for an apartment that was unsuitable for the Child. She denied the claim that Mother and Michael consulted with her before signing the lease. She acknowledged that she has viewed their current residence but stated that the Child did not have a bedroom and that the one bedroom in the residence did not have a door or windows. She provided that the home was "fairly clean" and that she spoke with them concerning some adjustments to make the home suitable for the Child.

Ms. Crow testified that Mother has not provided proof of a mental health assessment other than her records from Ten Broeck. The records from Ten Broeck established that Mother presented with an "obvious intellectual disability" with "possible paranoid delusions" and "cognitive functioning in the disabled range," resulting in poor insight and judgment. The records contained the following diagnoses: unspecified nonorganic psychosis; a rule-out diagnosis of bipolar disorder, current manic episode with psychotic features; and mild intellectual disability.

Ms. Crow asserted that she has also received no documentation showing Mother's compliance with individual therapy or her filling of her medication that was prescribed while she was at Ten Broeck. Ms. Crow claimed that the primary barrier for reunification was Mother's failure to address her mental health and her overall lack of parenting skills.

- 6 -

Ms. Crow recalled that upon removal, the Child was underweight and experiencing issues with his legs that would require braces. She stated that the Child did not know how to engage with toys and was not yet toilet trained. She asserted that he is now much more engaged and participatory with the foster family and that his vocabulary has also expanded. She stated that his overall health has improved but claimed that his growth would likely be stunted forever due to malnutrition early in life. She provided that the foster parents were willing to care for him until he reached adulthood and that they have been working with DCS to secure long-term care once he reached adulthood. Foster Mother confirmed the Child's improvement since removal and even stated that he has since become a little "chatterbox" at times. He receives weekly behavior services, speech therapy, physical therapy, and occupational therapy. She agreed that other than therapy appointments, Mother has attended the Child's medical appointments by telephone on a regular basis.

Following the hearing, the trial court granted the termination petition in its entirety on the grounds alleged by DCS. The court also found that termination was in the best interest of the Child. In so finding, the court credited Ms. Crow's testimony and indicated its concerns with both Mother and Michael's credibility. This timely appeal followed.

## II.  ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.      Whether the trial court abused its discretion by admitting Mother's medical records into evidence.

B.      Whether clear and convincing evidence supports the trial court's finding of statutory grounds for termination.

C.      Whether clear and convincing evidence supports the trial court's finding that termination of Mother's parental rights was in the best interest of the Child.

## III.  STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v.*

*Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in

termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W. 3d 662, 680 (Tenn. 2017).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "Thus, this court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359 at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.    DISCUSSION

### A.

Mother first takes issue with the trial court's admission of her mental health records from Ten Broeck Hospital, a 20-page document. She asserts that she objected to its admission at the hearing because it was not provided in discovery until October 9, 2020, four days before trial, a violation of Tennessee Code Annotated section 24-7-122(c), which provides as follows:

When [medical] records or reproductions of records are used at trial pursuant to this section, the party desiring to use the records or reproductions in evidence shall serve the opposing party with a copy of the records or reproductions no later than sixty (60) days before the trial, with notice that the records or reproductions may be offered in evidence, notwithstanding any other rules or statutes to the contrary.

"Generally, the admissibility of evidence is within the sound discretion of the trial court." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004); *see generally*

- 9 -

*Goodwin v. Hanebis*, M2017-01689-COA-R3-CV, 2018 WL 4145889, at \*2 (Tenn. Ct. App. Aug. 29, 2018) (reviewing the court's exclusion of medical records using the abuse of discretion standard of review). To determine whether a decision constitutes an abuse of discretion, we review the trial court's decision to ascertain: "(1) whether the factual basis of the decision is supported by sufficient evidence; (2) whether the trial court has correctly identified and properly applied the applicable legal principles; and (3) whether the trial court's decision is within the range of acceptable alternatives." *Gooding v. Gooding*, 477 S.W.3d 774, 780 (Tenn. Ct. App. 2015) (quotation omitted).

Our review of the record reflects that the trial court offered counsel additional time in which to review the evidence in lieu of excluding the evidence as requested. Counsel declined the trial court's offer. Section 24-7-122 does not require the exclusion of the evidence for failure to comply and also does not prescribe a remedy for its violation. "Although the Tennessee Rules of Civil Procedure do not provide a sanction for abuse of the discovery process, trial judges have the authority to take such action as is necessary to prevent discovery abuse. Trial courts have wide discretion to determine the appropriate sanction to be imposed." *Mercer*, 134 S.W.3d at 133 (citations omitted). We affirm the trial court's refusal to exclude the evidence in this case and its offer of a continuance to provide additional time in which to review the evidence.

B.

As indicated above, the court granted the termination petition based upon the following statutory grounds: (1) abandonment by failure to establish a suitable home; (2) the persistence of conditions which led to removal; (3) substantial noncompliance with the permanency plan; (4) failure to manifest an ability and willingness to care for the Child; and (5) a present mental condition affecting the mother's ability to adequately parent. The court also found that termination was in the best interest of the Child. Mother claims that the court's use of the medical records in its support of the termination decision was error but does not offer argument directly disputing the statutory grounds or best interest finding. Having concluded that the court did not err in its consideration of the records, we will review each ground and the court's best interest finding in turn. *In re Carrington H.*, 483 S.W.3d at 525-26 ("[T]he Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

### 1. Abandonment by failure to establish a suitable home

A parent may be found to have abandoned his or her child by failing to establish a suitable home. Tenn. Code Ann. § 36-1-113(g)(1). This ground for the termination of parental rights is established when:

(a)     The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b)     The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c)     For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). A "suitable home" means more than adequate "physical space" – it requires that the appropriate care and attention be given to the child as well. *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). Additionally, matters related to counseling and assessments are "directly related to the establishment and maintenance of a suitable home." *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009).

The record is replete with DCS's efforts to assist Mother and provide Mother with the Criteria for Termination of Parental Rights prior to the filing of the termination petition. The record further establishes Mother's failure to either respond or cooperate with services. While Mother has found housing on a number of occasions since removal, the current residence was unsuitable for the Child as presented to DCS. Mother has also yet to address her mental health concerns and lack of parenting skills, a matter directly related to the establishment of a suitable home for the Child. We conclude that there is clear and convincing evidence to support the trial court's determination that Mother's parental rights should be terminated on the ground of abandonment by failure to provide a suitable home.

- 11 -

### 2. *Persistence of conditions which led to removal*

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)     The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. The statute does not require that only the original conditions leading to removal be used to establish grounds for termination. On the contrary, the statute specifically includes both "[t]he conditions that led to the child's removal . . . or other conditions [ ] that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(i).

The record reflects that the conditions which led to removal in this case persist, namely Mother's mental health concerns. Other conditions also exist that would cause the Child further neglect, including Mother's lack of parenting skills and her inability to establish a suitable home for the Child. Following our review, we conclude that there is little likelihood that the conditions which led to removal and other conditions now found will be remedied at an early date so that the Child can be safely returned in the near future and that the continuation of the relationship greatly diminishes the Child's chances of early integration into a safe, stable and permanent home. Accordingly, we affirm the trial court on this ground of termination.

### 3. *Substantial noncompliance*

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *Id.* Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49. "Substantial" is defined as "of real worth and importance," Black's Law Dictionary (11th ed. 2019), and "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.

This ground for termination does not require that DCS "expend reasonable efforts to assist a parent in complying with the permanency plan requirements." *In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *7 (Tenn. Ct. App. June 21, 2017); *see also In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of [the Department's] efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

We, like the trial court, hold that the requirements of the plan were reasonably related to the grounds for removal but that Mother has failed to substantially comply with said requirements. As discussed previously, she has failed to address the most important aspects of her plan, namely her mental health and lack of parenting skills. Accordingly, we hold that there is clear and convincing evidence in the record to support the trial court's determination that Mother was in substantial noncompliance with the permanency plan, establishing yet another ground for termination.

### 4. *Failure to manifest an ability and willingness to assume custody*

The trial court found that DCS had proven by clear and convincing evidence that Mother's parental rights should be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(14), which provides as follows:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, a petitioner must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, a petitioner must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

As to the first element, our Supreme Court instructed as follows:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citation omitted) (resolving the split in authority regarding whether parental rights can be terminated if a parent has manifested a willingness, but not an ability to personally assume legal and physical custody or financial responsibility for the child).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it

- 14 -

indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732).

While Mother verbally expressed a willingness to assume responsibility for the Child at the hearing, her actions speak otherwise as evidenced by her failure to ready herself for the Child's return. She has further evidenced her inability to assume responsibility of him. The record supports a finding that placing him with her would pose a risk of substantial harm to his welfare given her failure to adequately address her mental health and her inability to care for the Child as evidenced by his malnutrition and stunted growth while in her care. We affirm the court's finding on this issue.

> 5. *Incompetent to Adequately Parent the Child due to a Present Mental Condition*

Under Tennessee law, a court may terminate parental rights when clear and convincing evidence is provided to establish that:

> (i)  The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future; and
>
> (ii)  That termination of parental . . . rights is in the best interest of the child[.]

Tenn. Code Ann. § 36-1-113(g)(8)(B). DCS bears the burden of demonstrating "by clear and convincing evidence both that [the parent] is presently unable to care for the [child] and that it is unlikely that [the parent] will be able to do so in the near future." *In re Keisheal*, No. M2012-01108-COA-R3-PT, 2013 WL 440061, at *7 (Tenn. Ct. App. Feb. 4, 2013) (citing Tenn. Code Ann. § 36-1-113(g)(8)). The statute also expressly provides that no finding of willfulness is required to establish this ground. Tenn. Code Ann. § 36–1-113(g)(8)(C).

The record reflects that Mother presented with an intellectual disability, "possible paranoid delusions," and "cognitive functioning in the disabled range," resulting in poor insight and judgment. While her intellectual disability alone is not a sufficient ground of termination, her corresponding impaired functioning that resulted in the Child's malnourished state, stunted growth, and unmet need for leg braces for proper development

- 15 -

at the time of removal is indicative of her inability to properly care for the Child. Mother's failure to cooperate with services or otherwise address her lack of proper care and supervision of the Child evidenced the likelihood that her inability to adequately care for the Child will persist. With these considerations in mind, we conclude that DCS proved by clear and convincing evidence that Mother is (1) presently incompetent to adequately provide for the care and supervision of the Child because of mental impairment and (2) such mental impairment is so likely to remain that it is unlikely that she will be able to resume care or responsibility for the Child in the near future. Accordingly, we affirm the trial court's finding on this issue.

C.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must consider whether termination was in the best interest of the Child. In making this determination, we are guided by the following non-exhaustive list of factors:

> (i)     In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;[7]
> >
> > (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> >
> > (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> >
> > (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

---

[7] *In re Kaliyah S.*, 455 S.W.3d at 555 ("[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent.").

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

We acknowledge Mother's love and concern for the Child. However, the fact remains that Mother has failed to ready herself for his return. Tenn. Code Ann. § 36-1-113(i)(1), (2). Meanwhile, the Child has bonded with those in his foster home and is thriving. A change of caretakers at this point in the Child's life would be detrimental to his emotional and medical condition. His current caretakers have expressed a desire to care for him until he attains the age of majority. They are also working with DCS to secure long-term care once he reaches adulthood. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to Mother's ability to provide a safe and stable home for the Child as evidenced by her failure to seek mental health treatment and to address the neglect that caused the Child's malnutrition and stunted growth. Tenn. Code Ann. § 36-1-113(i)(6), (8). While visitation opportunities were limited in the months prior to the filing of the termination

petition, Mother did not utilize the transportation services offered by DCS prior to the pandemic in April and May 2019, resulting in Ms. Crow's inability to secure additional transportation services. Mother also did not stay for visitation following the January 2020 hearing as planned and was inconsistent in her telephone contact with the Child. Her failure to visit has resulted in a lack of a meaningful relationship with the Child. Tenn. Code Ann. § 36-1-113(i)(3), (4). With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Child. We affirm the trial court.

## V.     CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellee, Misty B.

_____
JOHN W. McCLARTY, JUDGE